UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA PLAINTIFF

v. CRIMINAL ACTION NO. 3:11-CR-159-H

RUDOLFO VALENCIA DEFENDANT

**FINDINGS OF FACT**
**CONCLUSIONS OF LAW**
**AND RECOMMENDATION**

## FINDINGS OF FACT

This matter is before the Magistrate Judge by order of the District Court to consider a motion to suppress filed by Rudolfo Valencia (DN 71) who, along with three other individuals, is charged by federal indictment with a conspiracy to possess with intent to distribute 50 grams or more of methamphetamine, and with the knowing possession with intent to distribute the same (DN 1).

The indictment is the result of an investigation by the Elizabethtown, Kentucky Police Department and the Metro Narcotics Unit of the Louisville Metro Police Department (LMPD) that began on October 19, 2011. On that date. Sgt. Bill Edwards, a 23-year-veteran of the Elizabethtown Police Department, was contacted by Det. Jeff Gregory of the Kentucky State Police (KSP) Drug Enforcement Special Investigations Unit (DN 97, suppression hearing transcript (Tr.) 5). Det. Gregory, at the time, was assigned to the KSP Package Interdiction Unit and was working in coordination with the LMPD Metro Narcotics Unit (Id.).

Det. Gregory advised Sgt. Edwards during their first phone conversation that he had received information that several Hispanic males would be meeting an informant of the LMPD Metro Narcotics Unit in the Elizabethtown area to purchase meth that day. According to

the informant, the same men would depart with controlled substances in their possession (Id.). Edwards understood at the time that Gregory was receiving this information from the Metro Narcotics Unit, in particular, from LMPD Lt. Brian Nunn (Tr. 6). Sgt. Edwards, however, did not know the identity of the ultimate source of Gregory's information, other than the individual was an LMPD informant (Id.).

This first call occurred at approximately 3 p.m. on the afternoon of October 19, 2011 (Tr. 7). As a result of the call, Sgt. Edwards placed members of the Greater Hardin County Narcotics Task Force on alert (Id.). Edwards then left his office for the day and returned to his home where he received a second phone call from Det. Gregory at approximately 8 p.m. (Id.). Det. Gregory advised Sgt. Edwards that the suspects were in the Bardstown, Kentucky area. Sgt. Edwards, on receiving this information, left his home and drove to KSP Post No. 4 to pick up Det. Gregory. The two men then began driving together in the same vehicle toward Bardstown, Kentucky (Id).

While en route, Det. Gregory received information that the location for the meth buy had changed from Bardstown to the Bloomfield area of Nelson County. The detectives accordingly drove to Exit No. 34 on the Kentucky Bluegrass Parkway, the Bloomfield exit. At the exit was a gravel parking area that was used for a staging area for the investigation. Once there they were met two KSP police units, and subsequently by Lt. Nunn (Tr. 8). Lt. Nunn was the supervisor of the Major Case Squad of the LMPD Metro Narcotics Unit (Id.). Edwards had known Lt. Nunn for several years.

Lt. Nunn arrived at the parking area off Exit 34 at approximately 9:30 p.m. that evening. On arrival he briefed Sgt. Edward and Det. Gregory on the evolving situation. Lt.

Nunn was then receiving real-time updates from LMPD Det. Steve Healy, the primary case officer from the Metro Narcotics Unit, who was working directly with the confidential informant (Tr. 9). Det. Healy was calling Lt. Nunn to provide information on the status of developing events, which the Lieutenant in turn relayed to Sgt. Edwards and Det. Gregory (Id.).

Sgt. Edwards estimated that he and Det. Gregory remained at the staging area at Exit 34 for approximately 30 to 45 minutes (Tr. 10). During that time, Edwards received information that the suspect vehicle, described as being a red Chevy or GMC stepside truck, was located at 205 Drake Ridge Road in the Bloomfield area (Id.). This information came from Lt. Nunn based on his phone conversations with Det. Healy (Id.). Other LMPD officers were located in the Bloomfield area as part of the investigation during this time (Tr. 11, 12).

Based on the information received from Lt. Nunn, Sgt. Edwards understood that the two suspects were operating the red pickup truck described above (Tr. 12). Edwards was advised that LMPD officers had physical surveillance on the truck as it arrived at 205 Drake Ridge Road in Bloomfield and pulled into the garage at the residence (Tr. 12-13). LMPD officers had gone to the area of 205 Drake Ridge Road based on information they received from the informant that the red truck was going to drop off a substantial quantity of meth at that address (Tr. 13). Detectives Steve Healy and Joe Dennis of the LMPD were two of the officers that maintained surveillance on the residence at 205 Drake Ridge Road that evening (Tr. 67-68).

At that time, Sgt. Edwards knew that: (1) a red Chevy or GMC stepside truck; (2) operated by two Hispanic males; (3) from either the state of Georgia or Tennessee; (4) would be dropping off a substantial quantity of meth at the Drake Ridge location; and (5) the same men would depart with additional meth still in their possession (Id.). Based on his professional law

enforcement training and experience, Sgt. Edwards concluded that the truck had entered the garage so that meth could be removed from the vehicle (Tr. 13-14). The red GMC stepside pickup remained at 205 Drake Ridge Road for approximately 2 hours, a length of time that led Sgt. Edwards to believe that drugs were being off-loaded from the vehicle (Id.).

Because the Drake Ridge Residence was located in a remote area of Nelson County, approximately 15 miles from the staging area at Exit 34, Sgt. Edwards and Det. Gregory left the staging area to begin driving toward Drake Ridge Road (Tr. 16). Sgt. Edwards was aware that the LMPD officers in the Drake Ridge Road area were not as familiar with the local roads as he was (Id.). He therefore considered it important that he and Det. Gregory get in proximity to 205 Drake Ridge Road once the red truck departed the residence (Tr. 17).

Edwards and Gregory initially drove to Bloomfield, where they made contact with one of the LMPD narcotics detectives located just off the intersection of U.S. 62 and Ky. 55. After they briefed the detective, the two men continued on toward 205 Drake Ridge Road. Throughout this time, they maintained contact by radio and phone with other law enforcement officers involved in the investigation (Tr. 17). As they traveled, Edwards and Gregory overheard on the radio that the red truck was departing from the residence and was heading back toward Bloomfield (Id.). Gregory and Edwards turned their vehicle around and began to drive back to intercept the truck *(Id.)*. Consequently, they never arrived at the 205 Drake Ridge address, nor did Edwards ever observe any of the events that occurred there earlier that evening. Edwards and Gregory next learned that the red truck was driving on Ky. 55 toward Bloomfield and that the truck did have meth hidden inside it (Tr. 18). This information was received from Det. Steve Healy over the radio (Tr. 19).

As Edwards and Gregory were traveling on U.S. 62 back towards Bloomfield and approaching the intersection with Ky. 55, Sgt. Edwards observed a red pickup truck drive through the intersection (Id.). Several unmarked police vehicles were following behind (Id.). Edwards pulled onto Ky. 55 and began to pass the following vehicles in order to catch up to the truck (Id.). Upon approaching the vehicle, Edwards confirmed that it was a red GMC Sierra stepside truck (Tr. 19). Accordingly, what Edwards saw that evening, the red pickup truck being followed by unmarked police units, was consistent with the information that he had (Id.). Throughout these events, Edwards and Gregory continued to receive real-time information from other police officers involved in the investigation who are relating their observations (Tr. 20).

Edwards estimated that he followed the GMC truck for approximately 3-5 minutes as it drove out of Bloomfield toward the Bluegrass Parkway (Tr. 21). Edwards' vehicle was the third one behind the truck when it drove up the ramp to merge onto Ky. 55 (Id.). Once on Ky. 55, the truck drove past the entrance ramp to the Bluegrass Parkway. The two lead unmarked police units following the truck continued to drive past it as it pulled off onto the shoulder of the roadway with its wheels cut hard left in preparation for making a u-turn back onto Ky. 55 (Tr. 22).

At that time, Det. Edwards activated the emergency equipment on his own vehicle to stop the GMC truck from coming back onto Ky. 55 (Tr. 22). After activating the emergency equipment, Sgt. Edwards pulled up facing the driver's door of the truck so that the headlights of his vehicle would illuminate the inside of the pickup truck (Tr. 23). Edwards and Det. Gregory then exited their vehicle with Edward approaching the driver's side of the truck while Det. Gregory approached the passenger side door (Id.).

Sgt. Edwards went to the driver's side door where he spoke to the driver, Defendant Bryan Aleman (Id.). Edwards had already observed a temporary Georgia license tag on the vehicle, which led him to believe that the red GMC stepside truck had recently been purchased and was being used as a transport vehicle by individuals involved in the illegal distribution of controlled substances (Tr. 23). Edwards was aware from his training that vehicles used as transport for controlled substances are sometimes purchased by other persons to disguise the identity of persons involved in drug smuggling (Tr. 24).

Edwards had no specific information at that point about the occupants of the vehicle, other than they were reported to be Hispanic males (Tr. 24). Prior to activating his emergency equipment and stopping the truck, Edwards could see that it contained two occupants (Tr. 25). Once he activated the emergency equipment on his own vehicle and angled its headlights towards the driver's door of the truck, Edwards confirmed that the driver of the truck did appear to an Hispanic male, information consistent with what Edwards already knew (Id.).

Upon approaching the driver's side door, Edwards asked the driver, Aleman, to produce his driver's license. Aleman could not produce an operator's license (Id.). Upon exiting the truck, Aleman identified himself. Det. Gregory at that time removed the passenger from the other side of the truck. After Gregory asked for identification, the passenger identified himself as Rudolfo Valencia. This name was significant to Det. Edwards as Rudolfo Valencia was associated with an active DEA investigation and was a known source of methamphetamine from the Chattanooga, Tennessee area (Tr. 25-26). According to Edwards, neither Aleman nor Valencia resisted the order to exit the vehicle that evening (Tr. 26-27).

Det. Edwards then placed Aleman in handcuffs while advising him that he was

being detained pursuant to a criminal investigation into the distribution of controlled substances, but was not under arrest (Tr. 27). Valencia remained on the right side of the vehicle and was later placed in handcuffs by Det. Gregory (Id.).

While Sgt. Edwards talked with Aleman, he asked Aleman for consent to search the vehicle (Id.). Aleman advised Edwards that Aleman was not the owner of the truck, but Edwards could search it. As Det. Edwards approached the driver side door of the truck he smelled the odors of meth and silicone coming from the interior of the truck. At that point, other officers arrived on the scene and took control of Aleman while Edwards walked around to the passenger side of the vehicle to look in the glove box for ownership papers and insurance documents(Tr. 27-28).

When Edwards got to the passenger side of the vehicle, he noticed that the vinyl cover on the "A-post," the part of the door frame where the windshield and the vehicle meet, was loose and pulled away from the metal frame (Tr. 28). Edwards also could see what appeared to be fresh silicone around the area where the "vinyl wrap" would ordinarily be on the A-post (Id.). At that point, based on his sense of smell of meth and silicone, along with his narcotics investigation experience, Edwards concluded that certain body parts inside the vehicle had been moved and put back into place to hide drugs secreted in the truck (Tr. 29-30). Edwards concluded that the headliner of the truck had been pulled away from the vehicle to allow access behind it (Tr. 31).

Soon thereafter a K-9 drug detection dog arrived at the scene with his handler (Tr. 31). The canine performed an exterior sniff of the vehicle (Id.). After the drug detection dog alerted on the exterior of the vehicle, the dog was permitted to enter the interior of the truck (Tr.

32). The dog appeared to be very excited. It kept moving from the dashboard area to the headliner of the truck to the floorboard (Id.). After the dog was removed, Edwards spoke to the dog handler who advised that the canine "was all over the interior of the truck because the smell was so overwhelming." (Tr. 32).

Other police officers arrived on the scene during this time. Lt. Nunn arrived as did KSP Troopers Jenkins and Burton (Tr. 34). Members of the LMPD Metro Narcotics Unit also arrived within minutes after the vehicle stop (Tr. 33). Sgt. Edwards estimated that approximately 10 minutes passed between his initial encounter with Aleman and when the drug dog arrived on the scene (Id.). Edwards described the dog's behavior in the interior of the truck cab as being "spastic" due to the amount of drugs hidden in the cab which the dog was unable to locate (Tr. 35).

After the drug detection dog was removed from the truck, Sgt, Edwards and other officers began to search the interior of the vehicle (Tr. 36). The officers examined the A-post area where the liner had been pulled loose, the dashboard area, and underneath and behind the car seats (Id.). During the search, Sgt. Edwards received information from Det. Healy that drugs were hidden behind the headliner of the vehicle (Id.). At that point, Edwards removed the overhead courtesy light from its mounting. He could then see packaging material behind the headliner.

Sgt. Edwards sliced the package open and a small amount of a crystal-like substance that appeared to be meth fell out of the package (Id.). According to Sgt. Edwards, Det. Healy had received the information concerning the hidden location of the methamphetamine from his confidential informant (Tr. 36-37). Sgt. Edwards testified that the packaging material

hidden behind the headliner was consistent with the way that meth is packaged for transportation, and the contents of the package, once opened by Sgt. Edwards, also appeared to be consistent with methamphetamine (Tr. 37).

On cross-examination, Sgt. Edwards acknowledged that he received no information from any law enforcement officer that day that any officer had witnessed a drug transaction occur in the garage at 205 Drake Ridge Road (Tr. 65). Sgt. Edwards himself had not observed the premises at 205 Drake Ridge Road prior to the stop of the red GMC truck, and had not seen any criminal activity to that point (Tr. 54). The only information that the Sargent had was provided to him by Sgt. Gregory and Lt. Nunn, who received their information from Det. Healy and Healy's confidential informant in real time , along with the radio transmissions of the other officers involved in the investigation and Edwards' own observations (Tr. 58, 60).

Sgt. Edwards did not stop the red truck merely because the truck appeared to be preparing to make a u-turn (Tr. 65-66). Instead, he stopped the vehicle based on the information that he had received from other law enforcement officers that the truck contained illegal controlled substances (*Id*.).[1]

---

[1] At the conclusion of the hearing, counsel for Valencia moved the Court to introduce into evidence a videotape record of a prior state court preliminary hearing held in Nelson District Court related to the same vehicle stop (Tr. 70-71). The Court denied the Defendant's motion, ruling that the record of the state court proceedings could be used appropriately to impeach the testimony of the witness, but could not otherwise be introduced itself into evidence (Tr. 71). Counsel for Valencia then moved the Court to recess the hearing so that the defense could issue subpoenas for Detectives Healy and Dennis to obtain their testimony on what they observed during their surveillance of 205 Drake Ridge Road (Tr. 72). The Court denied the oral motion from the bench, but granted the defense leave to file a post-hearing written motion on the request to keep the hearing open to take additional evidence. The time for filing the post-hearing motion expired without the defense filing any further arguments on the issue (DN 94).

Valencia in his post-hearing brief maintains that he unsuccessfully attempted to electronically file his motion regarding Det. Healy and Dennis on July 13, 2012 (DN 105, p. 1,

## CONCLUSIONS OF LAW

Valencia argues in support of his motion to suppress that Det. Edwards lacked a reasonable suspicion to make a warrantless investigative stop of the red GMC Sierra truck on the evening of October 19, 2011. Specifically, Valenica claims that the information available to Edwards at the time of the stop was insufficient to satisfy the requirements of *Terry v. Ohio*, 392 U.S. at 9.

### a. Fourth Amendment.

The Fourth Amendment principles that govern investigative stops are well established. *United States v. Vite-Espinoza*, 342 F.3d 462, 466-67 (6th Cir. 2003) ("The generally applicable principles of search and seizure jurisprudence are well-known and settled."). A warrantless traffic stop is to be analyzed as an investigative detention under the principles of *Terry v. Ohio*, 392 U.S. at 9. *United States v. Wilson*, 506 F.3d 488, 492 (6th Cir. 2007) ("'An ordinary traffic stop is like an investigative detention, the scope of which is governed by *Terry* principles.'") (quoting *United States v. Perez*, 440 F.3d 363, 370 (6th Cir. 2006). Under *Terry*, a warrantless stop for questioning will be held to be reasonable if "'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'". *Vite-Espinoza*, 343 F.3d at 466 (quoting *Terry*, 392 U.S. at 21-22)).

The standard for reasonable suspicion under *Terry* is an objective one. *Id*. It requires that the detaining officers "'have a particularized and objective basis for suspecting the

---

fn. 1). Valencia did not previously inform the Court of this failed effort, nor did he seek additional time in light of it. Accordingly, the original ruling of the Court from the bench denying the motion stands.

particular person stopped of criminal activity.'" *United States v. Johnson*, 620 F.3d 685, 692 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). In determining whether such reasonable suspicion exists, the reviewing court is to look to the totality of the circumstances in place at the time of the seizure. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. McCauley*, 584 F.3d 440, 443 (6th Cir. 2008). No fact is to be analyzed in isolation. *United States v. Williams*, 615 F.3d 567, 666 (6th Cir. 2010); *United States v. Martin*, 289 F.3d 392, 397 (6th Cir. 2002) ("[C]ourts do not separately scrutinize each factor relied on by the officer conducting the search.") Consequently, a series of acts that independently may appear innocent, when taken together can justify further investigation. *Arvizu*, 534 U.S. at 274.

Officers in conducting such an investigation are fully entitled to rely upon their professional experience and specialized training to draw inferences from and make deductions about the cumulative information available to them, information that might well seem entirely innocuous to the untrained eye. *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006). Among the facts that an officer may fully consider in the totality of the circumstances is the presence of a suspect in an area of expected criminal activity at an unusual hour. Such circumstances by themselves are not sufficient, however, to support a reasonable, particularized suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *United States v. Caruthers*, 458 F.3d 459, 467-68 (6th Cir. 2006).

Other examples of the type of circumstances that the investigating officers may take into consideration are the officers' own direct observations, information received from police dispatch, directions or information from other police officers involved in the investigation, as well as the area and time of day during which the suspicious activities occurred. *United States*

*v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008); *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008). Police also may consider information provided a confidential informant. *See United States v. Mille*, 314 F.3d 265 (6th Cir. 2002), *cert. denied*, 539 U.S. 908 (2003). The reliability, veracity and basis of the informant's knowledge are all matters to be considered as well. *See United States v. Smith*, 182 F.3d 473, 477-78 (6th Cir. 1999). No one factor is to be given controlling weight in this analysis. *See Illinois v. Gates*, 462 U.S. at 233. When facts known to the officers confirm the accuracy of information supplied by a confidential informant, such facts may be relied on to substantiate the reliability of the informant. *United States v. May*, 399 F.3d 817, 824 (6th Cir. 2005).

What is important in this regard is the collective information available to the officers at the time of the warrantless stop itself. *United States v. Torres-Ramos*, 536 F.3d 542, 552 (6th Cir. 2008), *cert. denied*, *Rahburn v. United States*, 129 S.Ct. 772 (2008); *Feathers v. Aey*, 319 F.3d 843, 848-49 (6th Cir. 2003) (totality of the circumstances involves consideration of "all of the information available to law enforcement officials at the time"). The Court in considering this totality of the circumstances will review the evidence offered in support of reasonable suspicion "using a commonsense approach as understood by those in the field of law enforcement." *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004) (citing *Cortez*, 449 U.S. at 417-18).

The Government bears the burden to prove by a preponderance of the evidence the existence of a reasonable suspicion to believe, based on objective and articulable facts, that the Defendants were engaged in criminal activity at the time of the warrantless investigative stop. *Torez-Ramos*, 536 F.3d at 552. Certainty of criminal activity need not be shown in order

for a suspicion to be objectively reasonable under the Fourth Amendment. *United States v. Flores*, 571 F.3d 541, 545 (6th Cir. 2009) ("but law enforcement officers need not have certainty in order for a suspicion to be reasonable"). In fact, the level of suspicion necessary for a warrantless investigative stop is relatively minimal and "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). While an inchoate or unparticularized suspicion or "hunch" will not suffice, so long as articulable facts reasonably suggest that criminal activity "may be afoot," even though the officers involved lack probable cause for the challenged stop, such an investigatory stop will be constitutionally reasonable under *Terry*. *Id*.

The analytical framework of *Terry* requires that courts also address a related question about the degree of intrusion once a suspect has been lawfully stopped. *See, United States v. Campbell*, 549 F.3d 364, 370-72 (6th Cir. 2008). In other words, a lawful *Terry* stop must not only be justified at the point of its inception, but additionally must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (citing *Blair*, 524 F.3d at 750). The investigative detention must last no longer nor be more intrusive than is necessary to carry out the purpose of the stop otherwise a temporary investigative stop will become an arrest that must be supported by probable cause. *Dorsey*, 517 F.3d at 398; *United States v. Garcia*, 496 F.3d 495, 504 (6th Cir. 2007). *See also, Torres-Ramos*, 536 F.3d at 551-52 ("If the detention is proper, then the second question is 'whether the degree of intrusion ... was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officers' conduct given their suspicions and surrounding circumstances.") (citing *United States v. Caruthers*, 458 F.3d at 464).

Safety concerns are an integral factor in *Terry* stop situations. *Campbell*, 549 F.3d at 371-72. For example, a legitimate concern for officer safety will permit the police to order the driver and passenger out of a stopped vehicle. *Id*. When a reasonable suspicion exists that such individuals may be armed and dangerous, the officer may conduct a pat-down search as well. *Id*. The officers involved are likewise permitted to ask the detained individuals a moderate number of questions in order to determine their identity and to confirm or to dispel the officer's reasonable suspicions. *United States v. Butler*, 223 F.3d 368, 374 (6th Cir. 2000). The critical question for this portion of the *Terry* analysis is whether a reasonably prudent officer in the same circumstances would be warranted in believing that his or her safety or that of the public is in danger. *United States v. Campbell*, 486 F.3d 949, 955 (6th Cir. 2007). With these standards in mind, the Court turns to the facts as they existed at the time that the red pickup truck was stopped by Sgt. Edward on the evening of Oct. 19, 2011.

**b. Analysis of the Facts.**

Examination of the totality of the circumstances readily persuades the Court that Sgt. Edwards and his fellow officers possessed a reasonable suspicion under *Terry* that the occupants of the red GMC Sierra pickup truck were involved in illegal drug activity at the time of the stop. Sgt. Edwards was aware of specific and articulable facts giving rise to an objectively reasonable suspicion that the occupants of the truck had just completed an illegal meth transaction and were in possession of substantial quantities of meth hidden within the truck.

Edwards had received information earlier that afternoon from Det. Gregory that a meth buy would be going down that day in the Elizabethtown area. This information came from

a confidential informant known to LMPD Det. Steve Healey, who had successfully used the informant in the past. Throughout the day the informant provided real-time information that was repeatedly confirmed by the direct surveillance of officers involved in the investigation.

For example, Sgt. Edwards learned by 8 p.m. that evening that the location for the meth deal had changed and that the suspects, two Hispanic males, were in the Bardstown area. After Sgt. Edwards picked up Det. Gregory, the two men drove to the Bloomfield exit no. 34, the Bluegrass Parkway, where they received additional information through Lt. Nunn that Det. Healey's confidential informant had advised that the two suspects were driving a red Chevy or GM stepside pickup truck and that they would be traveling to a residence located at 205 Drake Ridge Rd.

Surveillance at the Drake Ridge Rd. address confirmed the arrival of a red truck with two occupants. The truck pulled into the garage of the home where it remained for the next two hours - - a span of time that persuaded Sgt. Edwards that the occupants of the truck were engaged in removing hidden drugs from within the vehicle. At this point in time, Sgt. Edwards was aware that the direct observation of other officers involved in the investigation had confirmed the accuracy of the initial information provided by the informant, who had correctly identified the subject vehicle, the number of its occupants, their nationality and their destination. The confidential informant also had correctly advised the law enforcement officers involved when the red GMC Sierra truck departed from the residence at 205 Drake Ridge Rd. that evening. The confidential informant further related to Det. Healey that methamphetamine would be found hidden inside the same truck.

Sgt. Edwards was driving to intercept the red truck when he learned that the

vehicle had changed direction. After initially heading toward Lawrenceburg, Kentucky, the truck was observed by LMPD surveillance officers who were following the vehicle to change direction and head back toward Bloomfield, Kentucky. Surveillance officers maintained sight of the vehicle, which Sgt. Edwards first saw on U.S. 62 approaching Ky. 55. After Edwards drove around the surveillance officers following the vehicle, he confirmed that the truck matched the description provided by the confidential informant. The truck then appeared to begin to make a u-turn after Edwards had been following it for approximately 3-5 minutes. The vehicle pulled over to the shoulder of Ky. 55 after passing the on-ramp to the Bluegrass Parkway and appeared to being preparing to cut back in the other direction to go north when Sgt. Edwards initiated the stop.

      At that point, Sgt. Edwards had directly confirmed by his own observations that the truck matched the description provided by the confidential informant, that the truck contained two occupants as the informant advised, that it had traveled to, and come from, the 205 Drake Ridge residence as predicted by the informant, and that the same informant, who had previously provided information to Det. Steve Healey, had advised Healey that the truck contained substantial quantities of meth.

      All of these facts taken together are more than sufficient to create an objectively reasonable belief based on specific and articulable facts that the occupants of the truck were involved in criminal activity and that illicit controlled substances would be found hidden within the vehicle. The warrantless stop of the vehicle by Sgt. Edwards therefore did not violate the Fourth Amendment rights of Defendant Valencia. To the contrary, the stop was clearly based on a reasonable suspicion under the totality of the circumstances as they existed at the time. *See*

*U.S. v. Hearn*, 500 F.3d 479, 483 n. 3 (6th Cir. 2007)(authorities lawfully stopped defendant's car without a warrant based on reasonable suspicion after a confidential informant provided police with the color of the vehicle, its location, a description of where it would be traveling and information that the defendant had taken illegal drugs from his apartment, put them in his car, and would be driving to Nashville to sell them at a "rave" party.); *U.S. v. Hunter*, 333 Fed. Appx. 920, 924 (6th Cir. 2009)("Tips containing specific predictive information from a known and reliable CI, which officers investigate and verify, may have the sufficient indicia of reliability to justify a *Terry* stop.")(citing *Adams v. Williams*, 407 U.S. 143, 146-47 (1972)).

None of the events that occurred immediately following the stop were placed at issue by Defendant Valencia in his pre-hearing motion. Valencia did not raise any pre-hearing argument that the *Terry* stop, although perhaps lawful at its inception, became unreasonable due to the length of the stop or the manner in which it was conducted.[2] Ordinarily, a *Terry* stop must be reasonably related to and last no longer than necessary to carry out the purpose of the stop. *United States v. Garcia*, 496 F.3d at 504; *Torres-Ramos*, 536 F.3d at 551-52. A review of the events that occurred immediately following the stop reveals that Sgt. Edwards acquired information soon after the stop that established probable cause to search the vehicle and place both the driver and Defendant Valencia under arrest.

Upon stopping the vehicle, the driver, Brian Aleman, and passenger Defendant Valencia, were lawfully ordered to exit the vehicle. *Campbell*, 549 F.3d at 371-72. Sgt. Edwards also lawfully asked Aleman for his driver's license and identification. *United States v.*

[2]Valencia does argue in his post-hearing motion that the alert by the drug detection dog did not establish probable cause to search given the absence of any testimony concerning the training or certification of the dog. (DN 105, p. 8).

*Butler*, 223 F.3d 368, 374 (6th Cir. 2000). Throughout these events, Sgt. Edwards was appropriately concerned for his safety given his belief that a substantial amount of meth would be found in the truck. In fact, when the detective initially approached the open driver side door of the vehicle, he smelled the strong odors of methamphetamine and silicone, both of which he was familiar with. He also observed the A-post on the passenger side of the vehicle where the vinyl appeared to have been pulled away from the post. Once again, he smelled the odor of methamphetamine coming from the open passenger side door.

These facts of themselves establish probable cause to search the vehicle, apart from the consent given by Aleman[3]. *See United States v. McCaster*, 466 Fed. Appx. 443, 446 (6th Cir. 2011)(odor of marijuana emanating from vehicle established probable cause for warrantless search)(citing *Unites States v. Foster*, 376 F.3d 577, 588 (6th Cir. 2004)(same); *United States v. Elkins*, 300 F.3d 628, 659 (6th Cir. 2002)("This court has held that an officer's detection of the smell of marijuana in an automobile can by itself establish probable cause for a search." )). A drug dog called to the scene within ten minutes of the initial stop also did alert on the exterior of the vehicle, indicating the presence of drugs. *United States v. Sharp*, appeal no. 10-6127, slip op. at p. 1 (6th Cir. July 27, 2012)("It is well-settled that a dog's sniff around the exterior of a car is not a search under the Fourth Amendment."). Sgt. Edwards, however, did not rely solely on

---

[3] Defendant Valencia does not challenge the existence nor the sufficiency of Brian Aleman's oral consent for Sgt. Edwards to search the truck. Voluntary consent to a warrantless search by Aleman, the driver of the stopped vehicle, would itself be a sufficient independent basis for a constitutional search of the vehicle. *See United States v. Collins*, 683 F.3d 697, 700-03 (6th Cir. 2012)(non-owner of jeep pulled over for speeding in Jackson Tennessee voluntarily consented to the warrantless lawful search of the vehicle).The Court does not rest its recommendation on Aleman's consent to search, however, given the clear existence of probable cause to search.

the alert of the drug detection dog as justification for his search of the vehicle. Rather, the totality of the circumstances, including the earlier information provided through the confidential informant, and the strong odor of methamphetamine coming from the truck, were more than sufficient to establish probable cause to believe that the vehicle contained contraband.

Sgt. Edwards was lawfully entitled, under the automobile exception to the search warrant requirement, to conduct a search of the interior of the vehicle for methamphetamine. *See United States v. Galaviz,* 645 F.3d 347, 354-55 (6th Cir. 2011)(" The automobile exception allows officers to search a vehicle without a warrant if they have 'probable cause to believe that the vehicle contains evidence of a crime.'")(quoting *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007). He likewise acted properly when he opened the package hidden in the headliner of the truck, which appeared to him based on his experience to be packaging routinely used to store methamphetamine. *United States v. Crotinger*, 928 F.2d 203-05 (6th Cir. 1991)(If the police have probable cause to search a lawfully stopped vehicle for contraband, then the police have probable cause to search every part of the vehicle and all containers found therein in which the object of the search could be hidden.)(citing *United States v. Ross,* 456 U.S. 798, 824 (1982)). Accordingly, no Fourth Amendment violation was occasioned either by the stop of the vehicle or the subsequent search of it by Det. Edwards.[4]

---

[4] Defendant Valencia in his post-hearing brief suggests that if the District Court denies his motion to suppress a hearing should be held pursuant to *Franks v Delaware,* 438 U.S. 154 (1978). (DN 105, p. 7). The sole basis for this suggestion is the perceived delay by police in making their warrantless stop of the red truck following its departure from the Drake Ridge property. Valencia insists that if the police had truly felt that they had sufficient articulable facts on which to believe that the truck contained methamphetamine, they would not have delayed until the vehicle reached highway Ky 55 to make the stop.

This concern of Valencia, however, is misplaced for several important reasons. First *Franks* applies only when a defendant makes a substantial preliminary showing that a false

**RECOMMENDATION**

The Magistrate Judge having made findings of fact and conclusions of law hereby recommends that the motion of the defendant to suppress be **DENIED.**

September 13, 2012

**Dave Whalin, Magistrate Judge**
**United States District Court**

**NOTICE**

Within fourteen (14) days after being served a copy of these proposed Findings and Recommendation, any party who wishes to object must file and serve written objections or further appeal is waived. *Thomas v. Arn,* 728 F.2d 813 (6th Cir. 1984), *aff'd.*, 474 U.S. 140 (1985). 28 U.S.C. § 636(b)(1)(c); Fed.R.Civ.P. 72(b).

Copies to Counsel of Record

---

statement has been knowingly, intentionally, or with reckless disregard for the truth, included by an affiant in a search warrant affidavit; and second, the allegedly false statement must have been necessary to the finding of probable cause based on the warrant. *See United States v. Poulsen,* 655 F.3d 492, 504 (6th Cir. 2011), *cert den.*, 132 S. Ct. 1772 (2012). Here, we have no search warrant. We have no officer affiant who has provided information for a search warrant affidavit. Finally, we have no preliminary, substantial showing of falsity of Sgt. Edwards' testimony. In short, nothing indicates that *Franks* has any role to play in the warrantless stop of a vehicle.